### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

OMAR GRAYSON,

     **Plaintiff,**

v.

                              **Case No. 3:17-CV-00539-NJR**

SEAN FURLOW and
THOMAS SPILLER,

     **Defendants.**

## MEMORANDUM AND ORDER

Pending before the Court is a Motion for Summary Judgment by Defendants Sean Furlow ("Furlow") and Thomas Spiller ("Spiller") (Doc. 77). For the reasons set forth below, the Court grants in part and denies in part the Motion.

This action stems from events which occurred during Plaintiff Omar Grayson's ("Grayson") term of incarceration at Pinckneyville Correctional Facility, a medium-security facility operated by the Illinois Department of Corrections ("IDOC").

### FACTUAL AND PROCEDURAL BACKGROUND

*Grayson's characteristics and past litigation*

Grayson for many years has been a practicing member of a religious group known as the African Hebrew Israelites (Doc. 77-1 at 4). Among the components of that religion is a non-mandatory practice called the "Nazarite Vow," which requires participants to refrain from cutting their hair and to allow their hair to naturally grow into the hairstyle commonly referred to as dreadlocks (*Id.* at 5). Grayson's religious practice included the restrictions of the Nazarite Vow, and he grew his hair into dreadlocks.

Unfortunately, Grayson's religious practice repeatedly came into conflict with IDOC's regulations on inmate hair. In a series of civil suits,[1] Grayson has challenged these practices and their application by individual IDOC employees.

*Illinois Law and Regulation on Inmate Hairstyles*

Title 20, Section 502.110(a) of the Illinois Administrative Code provides that inmates in IDOC facilities "may have any length of hair, sideburns, mustaches, or beards so long as they are kept neat and clean and do not create a security risk." From this provision, IDOC promulgated its own internal Administrative Directive 5.3.160 on individual grooming by inmates, which generally provides for action to be taken where an inmate's hairstyle is deemed to present a risk to health, sanitation, or security (Doc 77-2 at 13). Pinckneyville implemented its own individual grooming policy based on this Administrative Directive (*Id.* at 31).

Defendant Furlow stated in his deposition that this Pinckneyville-specific policy did not differ substantively from Administrative Directive 5.3.160. Common practices under Pinckneyville's inmate hairstyle policy included a practice of requiring that inmates be able to "freely flow their hands through their hair" upon a transfer from the facility in order to allow for a search, and a requirement that braids or dreadlocks be removed upon taking an identification photo before transfer, "so [the] picture looks like

---

[1] *Grayson v. Evans et al.*, 09-cv-00829 (S.D. Ill.) (relating to time at Big Muddy, voluntarily dismissed); *Grayson v. Schuler et al.*, 09-cv-00335 (S.D. Ill.) (relating to time at Big Muddy, dismissal reversed by Seventh Circuit, settled by parties); *Grayson v. Schuler*, 666 F.3d 450 (7th Cir. 2012) (reversing dismissal) (Posner, J.); *Grayson v. Goetting et al.*, 13-cv-01251 (S.D. Ill.) (relating to time at Stateville, dismissed on MSJ for failure to exhaust administrative remedies); *Grayson v. Goetting et al.*, 15-cv-00198 (S.D. Ill.) (relating to time at Pinckneyville, dismissed on MSJ for failure to demonstrate personal involvement of the defendants, sovereign immunity); *Grayson v. Goetting et al.*, 15-cv-00981 (S.D. Ill.) (relating to time at Pinckneyville, jury verdict for the defendants, case currently on appeal).

them" (Doc. 77-2 at 17-19). In addition to general grooming policies, staff at Pinckneyville imposed individual grooming policies on offenders whose hairstyle was deemed to present a health, sanitation, or security risk (*Id.* at 14-15). When an individual's hairstyle had been identified as creating a security risk, staff members would notify the inmate and request that the hair be removed or rearranged to make it more readily searchable (*Id.* at 24-25). Refusing inmates would be placed in isolation until they complied, an incident report would be written, and a picture would be taken of the inmate for documentation (*Id.*). The Pinckneyville policy also provided that inmates would be notified of the facility's grooming policy through the Offender Orientation Manual provided upon intake (*Id.* at 33).

Furlow also stated in his deposition that the initial decision to start the process of determining if an individual might be in violation of the grooming policy was a subjective test based on individual staff members' examination of inmates, and that "reasonable minds can differ" but that further disciplinary steps depended on confirmation by other individuals in the chain of command, up to the warden, that the hair presented an issue (*Id.* at 46-48). Furlow further indicated that forced removal of offending hairstyles was considered a last resort and occurred rarely, perhaps twice between February of 2014 and June 2016 (*Id.* at 48). Furlow further stated that in his 18 years at Pinckneyville, no exception had ever been made to the grooming policy for religious reasons (*Id.* at 63).

Presented with an image of a long-haired inmate from another IDOC facility, Furlow stated that the presence of the hairstyle indicated lax enforcement and willful ignorance of the security risk on the part of the other facility, and that if presented with

such a hairstyle at Pinckneyville, he would feel compelled to institute an individual

grooming policy, regardless of religion (*Id.* at 78-79, 82).

Prior litigation surrounding regulation of inmate hairstyles at Pinckneyville and

other IDOC facilities contrasts with Furlow's account, however. In *Grayson*, 666 F.3d 450,

a response to Grayson's grievance regarding his individual grooming policy indicates

that his request for an exception was denied because "[a]ccording to Chapelin [sic] Kline,

there is nothing in the African Hebrew Isrealite [sic] religion requiring dredlocks [sic] as

part of the religion[,]" indicating that religion was considered in determining whether to

require Grayson to cut his hair. *Grayson*, 09-cv-00335, Doc. 18-1 at 4 (S.D. Ill.). This seems

to be more in line with practice in other prisons, as a cursory glance at public records

reveals other cases involving inmates who were permitted to grow dreadlocks at other

IDOC facilities. In *Holmes v. Engelson*, 16-cv-05234, Doc. 39 (N.D. Ill. Aug. 9, 2017), a

Rastafarian inmate brought claims stemming from the removal of his dreadlocks prior to

a transfer to Pontiac Correctional Center, a different medium-security facility operated

by IDOC. While Holmes's hair was removed for transfer, once at Pontiac he appears to

have been permitted to grow dreadlocks, as his ID photo indicates:



K84657 - HOLMES, JACOB

*Id.* at 8.

Similarly, *Njie v. Dorethy*, 766 F. App'x 387 (7th Cir. 2019), involved the treatment

of a Rastafarian inmate with dreadlocks at Hill Correctional Center, another medium-

security facility operated by IDOC. In *Njie*, the Court found that Rastafarian inmates such

as Plaintiff Adama Njie were permitted to grow dreadlocks at Hill but were not permitted

to have contact visits with guests while retaining dreadlocks. *Id.* at 390.

*March 2015 Hair Removal Incident*

In the particular incident which serves as the basis for Grayson's instant complaint,

both Furlow and Grayson agree that around February 17-20, 2015, Furlow examined

Grayson's hair after Grayson had been issued a disciplinary ticket and found Grayson's

hair to be in violation of the grooming policy. Grayson states that this interest in his hair

arose because he was due for an ID photo, and Furlow indicated that he could not have

dreadlocks in the photo (Doc. 101 at 2). Furlow gave multiple rationales for taking issue

with Grayson's hair, first stating that "he was trying to not have his photo taken, drawing

attention to his hair…he had the twists, braids, matted hair sections…He had to take then

out for the [] photo" (Doc. 77-2 at 74). Furlow then subsequently indicated that he felt removal of Grayson's hairstyle was justified by under the Administrative Directive because Grayson's hairstyle presented a "security risk" and could not be searched (*Id.* at 75, 99).

On February 23, 2015, Grayson filed a Complaint and a Motion for Preliminary Injunction to prevent Defendants from cutting his hair. *Grayson v. Goeting et al.*, 15-cv-198-NJR-DGW, Doc. 1, ¶ 18 (S. D. Ill.). After his complaint was filed, the record shows that Grayson was issued a warning regarding his hair on March 6, 2015, by Furlow, but that Grayson refused to remove his hairstyle (Doc. 77-3). Furlow issued a second warning on March 6, 2015, and Grayson again refused to comply (*Id.*). Furlow gave Grayson a third and final warning on March 11, 2015, at which point forcible removal was ordered by Warden Spiller (*Id*). Grayson indicates that an identification photo was taken of him on the same day that his hair was forcibly removed (Doc. 42 at 3). On March 13, 2015, a magistrate judge issued a Report and Recommendation to the undersigned District Judge that the Motion for Preliminary Injunction be granted and that Defendants be enjoined from "cutting Plaintiff's hair or from combing out his dreadlocks[.]" *Grayson v. Goeting et al.*, 15-cv-198-NJR-DGW at Doc. 18, p. 8 (S.D. Ill.). Because Grayson's hair had already been cut, however, the Court found his Motion for Preliminary Injunction to be moot (Doc. 33).

Grayson brought this action on May 22, 2017, and subsequently filed an amended complaint on August 14, 2018 (Docs. 1, 42). As his *pro se* filing is construed by this Court, his amended complaint brings an action against Furlow and Spiller in their individual

capacities pursuant to 28 U.S.C. § 1983 (Doc. 42). While his amended complaint mentions a number of bases for relief, after screening by Magistrate Judge Wilkerson, Grayson is proceeding solely on the basis of claims for compensatory and punitive damages under (1) the First Amendment, (2) the Eighth Amendment, and (3) the Fourteenth Amendment.

Spiller and Furlow asserted in their answers to the complaint the affirmative defense of qualified immunity (Docs. 47, 71) and jointly filed the instant Motion for Summary Judgment on September 26, 2019 (Doc. 77).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317,232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses,

choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

## DISCUSSION

### I.     First Amendment

#### A. Applicable Law

Incarcerated individuals retain the right to free exercise of their religious beliefs guaranteed by the First Amendment. *Turner v. Safley,* 482 U.S. 78, 89–91 (1987); *Tarpley v. Allen County, In.,* 312 F.3d 895, 898 (7th Cir. 2002). Prison officials may restrict an inmate's ability to practice his faith, however, so long as the restriction is reasonably related to a legitimate penological interest, such as security or economic concerns. *Al–Alamin v. Gramley,* 926 F.2d 680, 686 (7th Cir. 1991). A categorical ban on long hair, justified by security concerns, would likely be permissible. *Grayson v. Schuler*, 666 F.3d at 452. However, permissible restrictions that are generally applied to the entire prison population may become impermissible when applied erratically or inconsistently across different prisoners, as when they favor one religious group over another. *Id.* at 453-55.

#### B. Discussion

Here, Defendants argue that they are entitled to summary judgment because (1) Pinckneyville's hairstyle policies are neutral rules of general applicability, and (2) there is no indication that they were intended to target his religious practice, as they were intended to ensure the safety and security of the prison. The factual record in this case, however, coupled with the public record from other actions concerning hairstyle

Page **8** of **15**

policies at Pinckneyville and other IDOC facilities, leaves room for doubt as to whether Pinckneyville's hairstyle policies are in fact neutrally applied or targeted towards specific religious groups.

The Court starts by noting that it may take judicial notice of past judicial proceedings, even where they are not formally introduced to the record, while recognizing that findings of fact in those past proceedings may be disputed. *E.g.*, *Limestone Dev. Corp. v. Vill. of Lemont*, 473 F. Supp. 2d 858, 868 (N.D. Ill. 2007). In this case, Grayson himself maintains that Pinckneyville does apply its hairstyle policies in a discriminatory fashion, targeting him as an African Hebrew Israelite while permitting others, such as Rastafarians, to grow dreadlocks. Grayson has been unable to present any evidence to support these claims other than his own word. Alone, Grayson's allegations may not appear credible.

Grayson's allegations appear better supported, however, in light of facts established in prior proceedings. In *Grayson*, 09-cv-00335, Doc. 18-1 at 4, a proceeding dealing with the same inmate at the same facility, a decision about whether or not to remove Grayson's hair was made based on subjective impressions of his religious beliefs, indicating that prison officials did differentiate between religious groups. This undercuts Furlow's statements to the effect that religion was not considered in determining whether to remove hair at Pinckneyville and undercuts Furlow's credibility. Defendants' position is further called into question by anecdotal evidence surrounding comparable practice at other IDOC facilities—cases such as *Holmes v. Engelson*, 16-cv-05234 (N.D. Ill. Aug. 9, 2017), and *Njie v. Dorethy*, 766 F. App'x 387 (7th Cir. 2019), indicate that other IDOC

facilities do consider religion in determining whether to remove inmate hairstyles and that many facilities do permit inmates to retain dreadlocks in certain circumstances. The fact that other facilities permit dreadlocks further appears to undercut the notion that Pinckneyville's policy is justified by security, as other medium-security facilities appear to have found ways to ensure security while allowing inmates to grow dreadlocks.

Overall, there is sufficient evidence to create a factual issue as to whether Pinckneyville's policy was in fact neutrally applied and whether it was justified by valid penological interests. Accordingly, summary judgment is denied on Grayson's First Amendment claim.

## II.      Eighth Amendment

### A. Applicable Law

The Eighth Amendment prohibits punishments which "involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Such gratuitous infliction of pain need not produce serious injury in order to violate the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Further, the wanton infliction of psychological pain is also prohibited. *Id.* at 16.

### B. Discussion

Here, Defendants argue that the removal of Grayson's hair was justified by a valid penological interest in prison security because Grayson's "dreadlocks were not able to be effectively searched" (Doc. 77 at 16). Courts have generally found regulation of inmate

hairstyles to be justified by security concerns. *E.g.*, *Grayson v. Schuler*, 666 F.3d at 452 (collecting cases). The Seventh Circuit's discussion of this issue was largely theoretical, however, and did not consider in depth the validity of the asserted penological justification for regulation of inmate hair length. Given the apparent diversity of practice and enforcement of hairstyle regulations among facilities of the same security level within the same prison system as Pinckneyville, the Court is skeptical that blanket imposition of a ban on dreadlocks would in fact be justified by prison security.

The Court need not address this question at this stage, however, for there are factual issues that prevent the Court from granting summary judgment. Even if security concerns justify a ban on dreadlocks, it is not clear that security concerns were in fact the reason for the removal of Grayson's dreadlocks in March 2015. Grayson alleges that this removal was in fact solely due to the fact that he was due for an ID photo, and the prison preferred that inmates be photographed without dreadlocks. Furlow's statements on this point are somewhat confused and inconsistent—while he states that Grayson's hair was unacceptable because it was not searchable, he also remarked that Grayson "was trying to not have his photo taken, drawing attention to his hair…he had the twists, braids, matted hair sections…He had to take them out for the [] photo" (Doc. 77-2 at 74). Furlow's statements and the timing of the haircut in relation to Grayson's ID photo seem to give some credence to Grayson's allegation that his hair was in fact cut solely because of the impending ID photo.

A second factual issue is whether Grayson's hair was, in fact, not searchable. As Furlow noted in his deposition, officer determinations as to violations of the grooming

policy were subjective, and opinions could differ. Grayson argues that his dreadlocks were in fact small and easily searchable—as IDOC seems not to retain photographs that Furlow purportedly took of Grayson's dreadlocks, the Court only has Furlow's and Grayson's conflicting accounts of the length and mass of Grayson's dreadlocks.

Accordingly, as factual disputes prevent the Court from determining whether the removal of Grayson's dreadlocks was based on a valid penological justification, summary judgment must be denied.

### III.    Fourteenth Amendment

#### A.    *Applicable Law*

When a Fourteenth Amendment equal protection claim is similar to a claim under another constitutional clause, courts will analyze the complaint under the most "explicit source[s] of constitutional protection." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Accordingly, Fourteenth Amendment equal protection claims that are essentially duplicative of First Amendment free exercise claims are routinely dismissed. *See Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir.2005) (dismissing equal protection and Eighth Amendment claims based on same circumstances as a free exercise claim because the free exercise claim "gains nothing by attracting additional constitutional labels").

Here, while Grayson does allege unequal treatment of different religious groups by Defendants, this allegation serves as the basis of his First Amendment Claim as well. The First Amendment is the provision most applicable to claims regarding treatment of the religious practices of two different groups, and for that reason the Court grants summary judgment and dismisses Grayson's Fourteenth Amendment claim. *See id.*

## IV.    Qualified Immunity

### A. *Applicable Law*

Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine if qualified immunity is appropriate, a court must assess whether an official's conduct violated a constitutional right, and second whether that right was clearly established. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). For a plaintiff to show that a right was clearly established, he must show that the right alleged to be violated was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010)).

### B. *Discussion*

Defendants argue that the rights at issue in this case were not clearly established because, in the case of First Amendment claims, the Seventh Circuit has stated that there is no clearly established standard for cases brought under the Free Exercise, noting ambiguity in whether there is a constitutional right to religious accommodation. Here, however, the question is not whether Defendants failed to accommodate Grayson, but rather if the policy in question had a valid penological justification and was applied equally to different religious groups. On this question, the Seventh Circuit has already ruled in a case involving the same plaintiff in the same facility. In *Grayson v. Schuler*, 666

F.3d 450 (7th Cir. 2012), the Seventh Circuit found that "the defendant is entitled to immunity if…he reasonably thought the plaintiff insincere in his religious belief, or a security threat…But there is no suggestion that the defendant ordered the plaintiff's dreadlocks shorn because of a reasonable belief in either of these possibilities." Here too, it is not clear that Defendants' application of the grooming policy was neutrally applied or that it was justified by security needs. If it was not both of those things, then Defendants would not be entitled to qualified immunity.

In the case of the Eighth Amendment claims, Defendants argue that finding them to be liable "without any evidence whatsoever that their actions were motivated by the intent to cause or knowledge that their actions would cause mental distress would be a change in the law" (Doc. 77 at 16). This may well be true, yet it is not credible that Defendants here would not have foreseen that shaving dreadlocks grown as part of an individual's sincere religious practice would cause mental distress. Indeed, it seems improbable that one could believe that forcibly removing the hair of even a non-religious inmate would not be a traumatic, distressing experience.

## V.     Punitive Damages

"Punitive damages may be awarded under § 1983 upon a showing of evil motive or intent, or…reckless or callous indifference to the federally protected rights of others." *Calhoun v. Detella*, 319 F.3d 936, 942 (7th Cir. 2003) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

Here, Defendants argue that Grayson has presented no evidence that they were motivated by religious animus or intended to violate his constitutional rights. Indeed,

Grayson does not have evidence of religious animus. He does, however, present evidence that Defendants were aware of the prior ruling of the Seventh Circuit regarding removal of his dreadlocks and that Defendants were aware that he had filed a motion for a preliminary injunction in this Court. Defendants chose to ignore his assertion that removal of his hair would violate his First Amendment rights and that his position was supported by the former ruling of the Seventh Circuit, instead removing his hair before this Court was able to address Grayson's motion for a preliminary injunction. Accordingly, it could be argued that Defendants did show reckless indifference to Grayson's constitutional rights, and the Court will not grant summary judgment on the issue of punitive damages.

CONCLUSION

The Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment (Doc. 77). This action shall proceed solely on Grayson's First Amendment and Eighth Amendment claims.

**IT IS SO ORDERED.**

**DATED:  August 31, 2020**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**